# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RODNEY GOOD, IRON WORKERS OF TENNESSEE VALLEY AND VICINITY WELFARE FUND, IRON WORKERS OF TENNESSEE VALLEY AND VICINITY PENSION FUND, and IRON WORKERS OF TENNESSEE VALLEY AND VICINITY ANNUITY FUND,** | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:21-cv-00337** |
| | ) | **Judge Aleta A. Trauger** |
| **TRITON STEEL GROUP, LLC a/k/a TRITON INDUSTRIES, LLC, and CHRISTOPHER ELLENBERGER,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM

Defendants Triton Steel Group, LLC ("Triton") and Christopher Ellenberger have filed a Motion to Reconsider and Dissolve Preliminary Injunction (Doc. No. 63), to which plaintiffs Rodney Good, Iron Workers of Tennessee Valley and Vicinity Welfare Fund, Iron Workers of Tennessee Valley and Vicinity Pension Fund, and Iron Workers of Tennessee Valley and Vicinity Annuity Fund have filed a Response (Doc. No. 65), and the defendants have filed a Reply (Doc. No. 69). The plaintiffs have filed a Motion to Strike Defendants' Affirmative Defenses (Doc. No. 75), to which the defendants have filed a Response (Doc. No. 78), and the plaintiffs have filed a Reply (Doc. No. 79). For the reasons set out herein, the defendants' motion will be denied, and the plaintiffs' motion will be granted in part and denied in part.

# I. BACKGROUND

## A. Procedural History

Because timing is important here, the court will begin with a chronology of the underlying litigation.

On April 27, 2021, Good and three multiemployer benefit plans associated with Iron Worker Local Unions of Tennessee Valley[1] and Vicinity filed a Complaint in this court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Doc. No. 1.) The Complaint asserts that Triton, at the direction of Ellenberger as an officer of the company, failed to make required contributions to the plaintiff plans in violation of 29 U.S.C. § 1145, also known as Section 515 of ERISA. (*Id.* ¶¶ 11–14.) The plaintiffs request (1) injunctive relief requiring Triton to make all required future contributions and (2) damages representing "all contributions that are owed as of the date of the judgment plus the greater of double interest or single interest plus liquidated damages, and all attorney fees and costs incurred in connection with this action." (*Id.* at 5.)

On April 28, 2021, Summonses were issued to Ellenberger individually and to Triton through Ellenberger as its registered agent. (Doc. No. 4.) The same day, the court entered a Notice setting the initial case management conference for June 28, 2021. (Doc. No. 5 at 1.)

On June 15, 2021, the plaintiffs filed a Proof of Service stating that Ellenberger (and Triton through Ellenberger) had been served by certified mail. (Doc. No. 6.) The receipt of delivery, however, had no recipient signature. Instead, the signature block merely contained the handwritten characters "COV 19," presumably indicating that an in-person physical signature was not obtained due to pandemic-related safety measures—an issue that has arisen in other cases, as well. *See, e.g.,*

---

[1] For convenience, the court will refer to this collective group of local unions as "the union."

2

*Brown v. Pepper & Peach, LLC*, No. 3:20-CV-01092, 2022 WL 179127, at *2 (M.D. Tenn. Jan. 19, 2022) (Hill, Clerk) (describing similar situation and noting that "[t]his type of notation is consistent with the USPS's COVID-era modification of its signature requirements for Certified Mail receipts").

The same day—June 15, 2021—the plaintiffs filed a Request for Entry of Default Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (Doc. No. 7.) The plaintiffs asserted that the defendants' deadline for filing a responsive pleading or motion had been May 22, 2021, but the defendants had failed to comply. (Doc. No. 7 at 1–2.) The plaintiffs argued that the court should therefore enter default on behalf of all defendants. (*Id.*) The plaintiffs also moved for the court to cancel the initial case management conference, which it did. (Doc. Nos. 9–10.)

On July 27, 2021, the Clerk of the Court denied the request for entry of default, citing the plaintiffs' failure to obtain a signature from Ellenberger or establish any adequate alternative basis for finding effective service. (Doc. No. 14 at 6–7.)

On July 30, 2021, the plaintiffs filed an additional Proof of Service, asserting, this time, that the process server effected personal service on Ellenberger on June 19, 2021. (Doc. No. 16.)

On August 2, 2021, the plaintiffs filed a Second Motion for Entry of Default (Doc. No. 17), followed shortly by an Amended Second Motion for Entry of Default (Doc. No. 19). Those motions requested default only against Ellenberger, not Triton. (*Id.*)

On September 14, 2021, the Clerk granted the Amended Motion and issued an Entry of Default against Ellenberger. (Doc. No. 26.) In the ensuing months, the plaintiffs continued efforts to perfect service against Triton. They sought and received extensions of time in which to do so. (Doc. Nos. 29, 31, 33–34.) The plaintiffs have filed a Declaration of Leann LaRose, a paralegal for plaintiffs' counsel, describing her communications with Ellenberger throughout this period:

> From this matter's inception, I have communicated with Christopher Ellenberger by telephone, electronic mail, and via the USPS. The email address provided to me by Mr. Ellenberger and his assistant, Sarah Berkley, in May 2021 was chris@tritongrouptn.com.
>
> From May through December 2021, Mr. Ellenberger regularly corresponded with me from chris@tritongrouptn.com; however, he ceased all communications in January 2022 and only responded via electronic mail again (from the same email account) after . . . April 12, 2022 . . . .[2]

(Doc. No. 66 at 1.)

In the meantime, on January 10, 2022, the plaintiffs filed a Motion for Entry of Default against Triton. (Doc. No. 36.) The plaintiffs explained:

> Plaintiffs have attempted to serve Triton via process server, certified mail, and the Secretary of State, as well as by communicating directly with the registered agent [Ellenberger] asking him to sign an acknowledgement of service, which he refused to do. As confirmed by the process server and supported by this history, Triton is evading service.

(*Id.* at 2 n.1.) The plaintiffs maintained that service through the Secretary of State was effective pursuant to Tenn. Code Ann. § 48-208-104(b), which permits a plaintiff to rely on the Secretary as the default agent of a defendant entity for the purposes of service of process in certain situations, including "whenever its registered agent cannot be found with reasonable diligence." Tenn. Code Ann. § 48-208-104(b).

On February 17, 2022, the Clerk issued an Entry of Default as to Triton. (Doc. No. 38.)

On February 21, 2022, the plaintiffs filed a Motion for Preliminary Injunction, asking the court to require the defendants "to submit reports and payments required under a collective bargaining agreement, since without payment of contributions, Triton's employees have been

---

[2] The defendants argue that the court should disregard Rose's Declaration because, although it is signed and states that it was made under penalty of perjury, it does not expressly state that the facts therein are true and correct or based on LaRose's personal knowledge. The Declaration, however, expressly deals with LaRose's own actions, of which she would necessarily have been aware. The court therefore finds no fatal deficiency in the Declaration.

4

harmed due to being deprived of retirement benefits." (Doc. No. 40 at 1.) On the same day, LaRose "served Mr. Ellenberger with copies of [the relevant filings] via electronic mail to chris@tritongrouptn.com . . . ." (Doc. No. 66 at 2.)

On February 22, 2022, the court granted the motion and entered an Order "requiring the timely future payment of contributions and submission of all monthly payroll reports, as required under 29 U.S.C. § 1145," as well as requiring that "[a]ll payments presently owing, and all payroll reports presently due shall be submitted to Plaintiff Funds within twenty (20) days of the date of entry of this order." (Doc. No. 43 at 2.)

On March 15, 2022, the plaintiffs filed a Motion to Conduct Hearing to Determine if [Triton] and its Agent, Christopher Ellenberger, Are in Civil Contempt. (Doc. No. 44.) The plaintiffs asserted that the defendants had failed to comply with the terms of the preliminary injunction. (*Id.* at 1–2.) The court granted the motion and set a show cause hearing for April 12, 2022. (Doc. No. 47 at 1.)

On April 12, 2022, the court held the hearing. The plaintiffs appeared through counsel, and Ellenberger appeared *pro se*.[3] Ellenberger told the court, "I do 100 percent wholeheartedly owe money, and I'm going to pay it. I just need to figure out how much that is and make sure these are correct." (Doc. No. 50 at 6.) Ellenberger indicated that he was willing to work with the plaintiffs in an attempt to come to terms regarding payments. (*Id.* at 9–10.)

The parties failed to resolve the matter between themselves, and, on April 26, 2022, the court held another hearing. Ellenberger, who again proceeded *pro se*, acknowledged that he had

---

[3] "[C]orporations or other forms of business entity . . . are not permitted to appear *pro se* in federal court litigation." *B.R.-S.O.H. LLC (Sons of Hemp) v. City of Detroit*, No. CV 17-11093, 2017 WL 2436029, at *1 n.1 (E.D. Mich. Apr. 24, 2017), *report and recommendation adopted*, No. 17-11093, 2017 WL 2436025 (E.D. Mich. June 5, 2017). Accordingly, Ellenberger's presence—though sufficient for his own personal appearance in court—did not satisfy Triton's distinct obligation to appear as well.

5

an obligation to comply with the preliminary injunction. He complained, however, that the full payments required would be too onerous. (Doc. No. 53 at 3–4.) The court did not hold Ellenberger or Triton in contempt at that time, but it held that the plaintiffs would be permitted to engage in discovery regarding the defendants' available assets. The court urged Ellenberger to obtain counsel. (*Id.* at 7–9.)

On May 18, 2022, an attorney, Roland W. Baggott III, filed a Notice of Appearance on behalf of Triton and Ellenberger. (Doc. No. 52 at 1.)

On June 9, 2022, Baggott filed a Motion to Set Aside Clerk's [Entry of] Default. (Doc. No. 56.) The defendants argued that they had potentially meritorious defenses to liability and that the court should afford them some lenience in light of the fact that they had been, until May of 2022, unrepresented by counsel. (*Id.* at 3–6.) As part of their briefing of the motion, the defendants indicated that they intended to dispute "[w]hether the Preliminary Injunction was merited." (*Id.* at 4.) Specifically, they wrote:

> On February 21, 2022, a mere four days after the Clerk's Entry of Default against Ellenberger, plaintiffs moved for a Preliminary Injunction, which motion was granted the very next day. There is no evidence in the record that either defendant was served with the Motion for Preliminary Injunction as required by Rule 4 or Rule 5 (as applicable) prior to it being granted summarily. There is no evidence in the record that either defendant had notice of the Motion as required by Rule 65(a)(1) prior to it being granted. There was no hearing, evidentiary or otherwise, on the Motion for Preliminary Injunction. The Court entered the plaintiffs' proposed order without making independent findings of fact or conclusions of law.

(*Id.* (citations omitted).) However, the defendants did not formally request any modification or reconsideration of the preliminary injunction at that time.

On June 23, 2022, the plaintiffs filed a Response indicating that they did not oppose the motion to set aside the defaults. (Doc. No. 61 at 1.)

On June 24, 2022, the court granted the motion and set aside the Entries of Default. (Doc. No. 62 at 1.)

On June 29, 2022, the defendants filed their Motion to Reconsider and Dissolve Preliminary Injunction (Doc. No. 63), which is now under consideration. The defendants have not supported their motion with any substantive evidence or argument based on the plaintiffs' likelihood of success or any of the other conventional preliminary injunction factors. *See Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020) (listing factors) (citation omitted). Rather, the defendants argue that the court should dissolve the injunction without prejudice on the ground that the defendants—who were unrepresented and in default at the time—received insufficient notice of the plaintiffs' request and were not afforded the typical 14-day response period before the motion was granted. (Doc. No. 63 at 4.) As the defendants envision matters, the plaintiffs could then file a new motion seeking the same preliminary relief.

## B. Triton's Answer and Affirmative Defenses

On August 12, 2022, the defendants each filed an Answer. (Doc. Nos. 71–72.) In addition to denying various of the plaintiffs' assertions, the defendants each pleaded nine largely identical affirmative defenses. Six of those affirmative defenses are at issue in the plaintiffs' Motion to Strike:

- The First Affirmative Defense is that "Triton is not an employer who is engaged in commerce or in any industry or activity affecting commerce" and that, therefore, "ERISA does not apply." (Doc. No. 71 at 3; Doc. No 72 at 3.)

- The Fourth Affirmative Defense is that there is no "live contract" between Triton and the union, because the contract was terminated. (Doc. No. 71 at 4; Doc. No. 72 at 4.)

7

- The Fifth Affirmative Defense is that the late fees associated with Triton's plan contributions represent an unlawfully usurious interest rate under Tenn. Code Ann. § 47-14-103(2) and that the contract between Triton and the union therefore "is not enforceable." (Doc. No. 71 at 4; Doc. No. 72 at 4–5.)

- The Sixth Affirmative Defense is that the plaintiffs failed to provide a contractually required notice of delinquency before filing suit. (Doc. No. 71 at 5; Doc. No. 72 at 5.)

- The Seventh Affirmative Defense it that the plaintiffs "did not provide notice of material breach and a reasonable opportunity to cure." (Doc. No. 71 at 5; Doc. No. 72 at 5.)

- The Eighth Affirmative Defense is that the plaintiffs failed to comply with the contractually mandated grievance procedure, including the requirement to submit the grievance to arbitration. (Doc. No. 71 at 5–6; Doc. No. 72 at 5–6.)

The plaintiffs argue that the court should strike each of those six defenses as incapable of succeeding. Striking the defenses at this stage, the plaintiffs argue, would conserve the resources of the parties and the court by limiting the scope of discovery.

## II. LEGAL STANDARD

### A. Motion to Reconsider

While the Federal Rules of Civil Procedure fail to explicitly address motions to reconsider interlocutory orders, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)); *see also In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.") (citing *Rodriguez*, 89 F. App'x

8

at 959; *Mallory*, 922 F.2d at 1282). Thus, district courts may "afford such relief from interlocutory orders as justice requires." *Rodriguez*, 89 F. App'x at 959 (quoting *Citibank N.A. v. FDIC*, 857 F. Supp. 976, 981 (D.D.C.1994)) (internal brackets omitted). Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct clear error or prevent manifest injustice. *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, 89 F. App'x at 959). This standard "vests significant discretion in district courts." *Rodriguez*, 89 F. App'x at 959 n.7.

## **B. Motion to Strike**

Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may "order any redundant, immaterial, impertinent, or scandalous matter stricken from any pleading, motion, or other paper." Fed R. Civ. P. 12(f). However, courts construing and applying Rule 12(f) have followed the rule that "[a] motion to strike is a drastic remedy that should be used sparingly and only when the purposes of justice require." *Driving Sch. Assoc. of Ohio v. Shipley*, No. 1:92-CV-00083, 2006 WL 2667017, at *1 (N.D. Ohio 2006) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).

A motion to strike an affirmative defense under Rule 12(f) "is proper if the defense is insufficient; that is, if 'as a matter of law, the defense cannot succeed under any circumstances.'" *S.E.C. v. Thorn*, No. 2:01-CV-290, 2002 WL 31412440, *2 (S.D. Ohio 2002) (quoting *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997)). A motion to strike should not be granted "if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *United States v. Pretty Prods. Inc.*, 780 F. Supp. 1488, 1498 (S.D. Ohio 1991) (quoting 5A Wright & Miller, Fed.

Prac. & Proc. § 1380 (1990)). The court "may only strike those defenses 'so legally insufficient that it is beyond cavil that defendants could not prevail on them.'" *Id.* (citation omitted). The decision whether to strike an affirmative defense is within the discretion of the district court. *See Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio 2005) ("Rule 12(f) permits the Court to act with discretion in that it *may* strike irrelevant and superfluous defenses or let them stand. There is absolutely no harm in letting them remain in the pleadings if, as the Plaintiff contends, they are inapplicable.").

## III. ANALYSIS

### A. Motion to Reconsider

The defendants argue that the court should set aside the preliminary injunction on the ground that the defendants were not afforded sufficient notice or time to oppose the plaintiffs' motion. The court, however, finds no merit in the argument that the notice that the plaintiffs provided was, in and of itself, defective in any way. Rule 65(a)(1) requires only "notice"—not a particular kind of notice—and the record shows that the plaintiffs sent their request to an email address that Ellenberger, by his own admission, was using at the time. (*See* Doc. No. 50 at 3; Doc. No. 66 at 1; *see also* Doc. No. 41 at 2, 8.) The defendants respond that they did not consent to service by email, but "[n]o service is required on a party who is in default for failing to appear." Fed. R. Civ. P. 5(a)(2). Moreover, "[t]he determination of whether a party has received notice of a preliminary injunction sufficient to satisfy Fed. R. Civ. P. 65(a) rests within the discretion of the district court," *Midmark Corp. v. Janak Healthcare Priv. Ltd.*, No. 3:14-CV-088, 2014 WL 1513009, at *1 (S.D. Ohio Apr. 16, 2014), and the court concluded then—as it does now—that notice was either sufficient or not required because the defendants were in default.

10

The defendants' objection that they were not given enough time to respond is potentially more persuasive. Admittedly, there is no specific minimum period of time that must elapse before a district court may act on a motion for a preliminary injunction, and the court is permitted to "determine the length of notice needed based on the urgency of the factual circumstances and the time available." *Laster v. D.C.*, 439 F. Supp. 2d 93, 100 (D.D.C. 2006) (citing *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000)). Nevertheless, granting such a motion after less than a day would typically raise a red flag, because it would not afford the nonmovant "an opportunity to respond and prepare an opposition." *Id.* (citing *Ciena Corp.*, 203 F.3d at 319).

An opportunity to respond, however, is only valuable to a party *willing* to respond, and a narrow focus on the time between the plaintiffs' formal request for an injunction and the court's Order does not paint a particularly full picture of the state of the case at that point. By the time the plaintiffs filed their motion on February 21, 2022, the plaintiffs had engaged in a nearly ten-month long process of trying, in vain, to get the defendants to participate in this litigation. Both defendants were in default. Ellenberger had been made aware of the case's existence but had refused to appear or have his company appear. Any suggestion that the defendants failed to oppose the plaintiffs' request solely because they were not afforded enough time to do so would therefore strain credulity. Everything in the record suggests that the defendants were simply ignoring this case's existence—and continued to do so until they faced the possibility of contempt of court.

Even with that in mind, if the defendants had responded to the court's ruling by actually seeking a timely opportunity to oppose the plaintiffs' motion, the court would have been inclined to grant that opportunity. Indeed, the court's Local Rules expressly contemplate precisely this situation and permit reconsideration—if it is timely sought: "The Court may act on the motion prior to the time allowed for response. In such event, the affected party may file a motion to

11

reconsider the Court's ruling within fourteen (14) days after service of the order reflecting the action of the Judge." L.R. 7.01(b). These defendants simply did not avail themselves of that opportunity.

The defendants' request therefore must be considered pursuant to the ordinary standards governing reconsideration of interlocutory orders. The defendants' procedural complaints, however, do not fall within the typical grounds for granting a motion to reconsider, particularly this long after the challenged decision. "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959 (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998)). The defendants have not identified any intervening change in the substantive law governing the parties' dispute, nor have they presented any new evidence. Moreover, any argument that a manifest injustice has occurred is significantly undermined by the fact that Ellenberger openly admitted to the court that he did, in fact, owe the plaintiffs money.

The only supposed injustice that the defendants have identified is that they were not afforded enough time to respond to the plaintiffs' motion. Whatever force that argument may have had in late February or early March of 2022, when the defendants could have filed a motion pursuant to L.R. 7.01(b), it is unavailing now. The defendants could have sought reconsideration of the preliminary injunction in a timely manner, but they did not. Even when the court held two separate hearings regarding the defendants' need to comply with the injunction, Ellenberger gave no indication whatsoever that he contested its validity. Rather, the defendants slept on their rights.

Even now, what the defendants have filed is not really a fully briefed motion for reconsideration in the usual sense. An ordinary motion to reconsider would have included some

12

substantive argument in favor of the defendants' position on the original motion, so that the court could actually *reconsider* its previous decision and, potentially, come out another way. This motion includes no argument along those lines. Rather, the defendants are not so much asking the court to consider the plaintiffs' motion anew, but to discard it—to wholly throw the plaintiffs' valid request for preliminary relief out and require the plaintiffs to start the process over again, despite the fact that, if anyone should be faulted for the court's quick ruling, it is the court, not the plaintiffs. The law requires no such result, and the court will not exercise its discretion to dictate it. The defendants' motion to reconsider will therefore be denied.

## B. Motion to Strike

### 1. Effect of Striking an Affirmative Defense

Federal Rule of Civil Procedure 8(c) generally requires a defendant to "affirmatively state any avoidance or affirmative defense" in its first response to a pleading, and the failure to do so may (but does not necessarily) result in waiver of the defense. *See Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018) (citing *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004); *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986)); *but see Shelbyville Hosp. Corp. v. Mosley*, No. 4:13-CV-88, 2017 WL 5586729, at *14 (E.D. Tenn. Nov. 20, 2017) ("[F]ailure to raise an affirmative defense by responsive pleading does not always result in waiver.") (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). As a practical matter, then, the inclusion of an affirmative defense in an answer often functions somewhat like the inclusion of a claim in a complaint; it establishes that the particular defense is actually part of the case before the court. A request to have a defense struck is, by extension, typically an effort to restrict the case's scope, not unlike a Rule 12(b)(6) motion that, although it does not seek outright dismissal

13

of all claims, asks the court to dispose of certain secondary claims that have not been sufficiently pleaded and would simply clutter the case as it moved into discovery.

Despite that similarity, however, it would be a mistake to assume, as some plaintiffs do, that a motion to strike an affirmative defense is simply the equivalent of a Rule 12(b)(6) motion—just with the shoe on the other foot. Two principles—one obvious and one less so—foreclose such an approach. First, Rule 12(f)'s "cannot succeed under any circumstances" standard is simply, on its face, far more demanding of the movant than Rule 12(b)(6) is. *See Hutchings v. Fed. Ins. Co.*, No. 6:08-CV-305-ORL-19KR, 2008 WL 4186994, at *2 (M.D. Fla. Sept. 8, 2008) (noting differences between standards under Rule 12(b)(6) and Rule 12(f)). The likelihood that a Rule 12(f) motion will actually take any meaningful issues off the board is therefore considerably lower than for a motion under Rule 12(b)(6).

Second, the potential effect of such a motion is curtailed by the fact that a defendant's pleaded affirmative defenses do not actually define the full scope of a defendant's case, because not every defense is an *affirmative* one in the parlance of the Federal Rules. "An affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Roberge v. Hannah Marine Corp.*, 124 F.3d 199 (Table), 1997 WL 468330, at *3 (6th Cir. Aug. 13, 1997). Aside from admitting or denying the specific allegations in the complaint, an answer is not required to do anything or plead anything to preserve the defendant's right to pursue a defense based on negating elements of the plaintiff's claims. Accordingly, whether a particular defense is available to a defendant may not actually depend on whether the defense was affirmatively pleaded at all—at least as long as the defendant was careful not to concede the particular element that the defense would negate. Many theoretical defenses will

14

therefore remain potentially available to a defendant, even if no corresponding pleaded affirmative defense can be found in its answer.

Combined, those two principles suggest that, in most cases, a motion to strike affirmative defenses will be both unlikely to succeed and unlikely to have much impact even if it is granted. That said, there are sometimes good reasons to strike a defense—particularly a meritless affirmative defense that, unless struck, would significantly expand the scope of issues under consideration in a case. It may, moreover, be helpful to obtain rulings from the court, at an early stage, on core legal issues that will determine the direction of litigation, and a motion to strike a defense may be one legitimate way to obtain such an early ruling, depending on the situation. Finally, the court notes that, as the Sixth Circuit has acknowledged, ERISA's provisions regarding collection of unpaid premiums reflect a decision by Congress to streamline such actions and avoid many of the complications ordinarily associated with labor/management disputes. Striking unnecessary defenses can therefore support the purposes of ERISA itself. *See Operating Engineers Loc. 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015).

### 2. Connection to Interstate Commerce (First Affirmative Defense)

ERISA applies "to any employee benefit plan if it is established or maintained . . . (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or (3) by both." 29 U.S.C. § 1003(a). As the plaintiffs correctly point out, this provision does not actually require that Triton itself be engaged in business in multiple states, as long as it participates in an industry that affects interstate commerce. *See Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1034 (6th Cir.

15

1993) ("ERISA applies to all employee benefit plans created by an employer engaged in interstate commerce or any industry affecting interstate commerce.")

As such, it is not ultimately determinative whether Triton engages in business outside of Tennessee. What matters, rather, is whether the business it engages in falls within "a class of activity that as a whole affects commerce." *Reber v. Provident Life & Acc. Ins. Co.*, 93 F. Supp. 2d 995, 1009 (S.D. Ind. 2000) (quoting *Usery v. Lacy*, 628 F.2d 1226, 1228 (9th Cir. 1980)). There is no remotely plausible argument that the construction and/or ironworking industries would fail that test. *See Outstate Mich. Trowel Trades Health & Welfare Fund v. Alpha Concrete Corp.*, No. 1:07-CV-746, 2008 WL 4960154, at *1 (W.D. Mich. Nov. 19, 2008) (holding that "the building and construction industry" is "an industry affecting commerce within the meaning of 29 U.S.C. § 185 and 29 U.S.C. § 1002(5) and (12)"). Indeed, despite the prevalence of ERISA-eligible plans in the construction field and the frequency of litigation under those plans, the defendants have not identified a single case adopting their position and finding these industries outside ERISA's scope. Rather, they rely on a 1991 out-of-circuit case involving a particular niche economic activity—the private management of "the estates of two families, the principal assets of which [were] entirely within Texas"—that, if anything, highlights the interstate character of the industries at issue here by contrast. *See Sheffield v. Allstate Life Ins. Co.*, 756 F. Supp. 309, 310 (S.D. Tex. 1991).

Indeed, the union contract at issue in this case itself makes clear that the union represents employees in an industry that crosses state lines:

> This agreement covers all work in the states of Tennessee, Missouri, Mississippi, Georgia, Kentucky, North Carolina, Alabama, Arkansas, and South Carolina, coming under the jurisdiction of the Iron Worker Local Unions of the Tennessee Valley and Vicinity, as defined in the Local Union charters and District Council boundary map.

16

(Doc. No. 56-1 at 5.) There is no colorable argument that the covered employees—scattered across multiple states in a nationwide industry that relies on expensive physical materials that must be processed, purchased, and shipped—are not engaged in activity directly affecting interstate commerce. Triton's First Affirmative Defense therefore has no meaningful possibility of success and will be struck.

### 3. Existence of a Contract (Fourth Affirmative Defense)

The Fourth Affirmative Defense asserts that the agreement between Triton and the union "was terminated" and that, as a result, "[t]he source of the obligation that the Plaintiffs claim has been breached is no longer in effect." (Doc. No. 71 at 4.) The plaintiffs respond that the defendants' claim that the agreement was terminated "has no basis in fact and fails as a matter of law" based on the language of the agreement itself. (Doc. No 76 at 8.) Specifically, the plaintiffs argue that, based on the language of the contract, the defendants could not have terminated the agreement earlier than April 30, 2023. (*See* Doc. No. 76 at 8–9.) The defendants argue that the plaintiffs have misconstrued the relevant termination provisions. (Doc. No. 78 at 12.)

The questions of whether the parties had a meeting of the minds regarding the early terminability of the contract and whether the contract was ever terminated potentially raise factual issues that would be inappropriate to resolve on a motion to strike. *See In re Est. of Josephson*, No. M2011-01792-COA-R3CV, 2012 WL 3984613, at *2 (Tenn. Ct. App. Sept. 11, 2012) ("Whether a meeting of the minds occurred is a question of fact."). The existence of an enforceable obligation is, moreover, an element of the plaintiffs' claims, meaning that, for reasons that the court has already discussed, striking this defense would not really take that issue off the table anyway. The court accordingly will not strike the Fourth Affirmative Defense. The court stresses, however, that its holding in this regard is not based on any conclusion that the defendants'

argument on this point is likely to succeed. Rather, the court's decision is based on the particular allocation of pleading burdens under Rule 8 and the high bar for striking a defense under Rule 12(f), as those principles apply to this potential defense.

Although the court will not strike this defense, the court will, in the interest of advancing the litigation, note one area in which the plaintiffs' characterization of the relevant law is more persuasive than the defendants'. The defendants argue that, unless there is a current live contract between Triton and the union, then this court has no jurisdiction under ERISA. As the plaintiffs point out, the Sixth Circuit has affirmatively rejected that position and held that the existence of a contract in an ERISA case is a merits issue. *See Operating Engineers' Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co.*, 43 F.4th 617, 622–24 (6th Cir. 2022); *see also Trustees of B.A.C. Loc. 32 Ins. Fund v. Fantin Enters., Inc.*, 163 F.3d 965, 970 (6th Cir. 1998) (considering ERISA action regarding contract that had been terminated). Moreover, while the court cannot yet make any kind of factual determination regarding termination of the contract, the court notes that the defendants have filed a purported Notice of Termination that was issued in August of 2022, well after this case was ongoing. (Doc. No. 77 at 1.) It therefore seems very unlikely that this defense is likely to succeed, at least as a mechanism for defeating past liability. Whether there is an ongoing, live contract between Triton and the union might be relevant to the availability of prospective remedies or to some merits questions, but it does not create any jurisdictional bar to this court's consideration of claims that arose when a contract was in place.

#### 4. Usurious Interest (Fifth Affirmative Defense)

The contract between Triton and the union included the following provision regarding late contributions:

> In the event the report and contributions are not received at the Funds office by the tenth (10th) day of the month following the month in which the due date occurs, a

18

late charge will be assessed against the Employer in an amount equal to 10% of the amount due. An interest charge will also be assessed against the Employer in an amount equal to 1% of the delinquent contributions. An additional interest charge of 1% will be assessed against the Employer for each succeeding month, or portion thereof, during which the Employer remains delinquent.

(Doc. No. 56-1 at 19.) In the defendants' Fifth Affirmative Defense, they argue that the 10% late fee and the 1% monthly interest—amounting to a rate of 12% per annum—violate Tenn. Code Ann. § 47-14-103, which provides:

Except as otherwise expressly provided by this chapter or by other statutes, the maximum effective rates of interest are as follows:

(1) For all transactions in which other statutes fix a maximum effective rate of interest for particular categories of creditors, lenders, or transactions, the rate so fixed;

(2) For all written contracts, including obligations issued by or on behalf of the state of Tennessee, any county, municipality, or district in the state, or any agency, authority, branch, bureau, commission, corporation, department, or instrumentality thereof, signed by the party to be charged, and not subject to subdivision (1), the applicable formula rate; and

(3) For all other transactions, ten percent (10%) per annum.

Tenn. Code Ann. § 47-14-103. The defendants allege that the formula rate during the time periods relevant to the plaintiffs' claims was originally 7.25% and was later raised to 8.75%. (Doc. No. 71 at 4.)

The plaintiffs argue that, to the extent that the Tennessee usurious interest statute would apply to these facts, it is preempted by the interest-related provisions of ERISA, including 29 U.S.C. § 1132(g)(2), which provides, in relevant part:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

19

(C) an amount equal to the greater of—

    (i)      interest on the unpaid contributions, or

    (ii)     liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A) . . . .

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2).

ERISA includes expansive preemption provisions that are intended to ensure that employee benefit plan regulation will be exclusively a federal concern. *See Aetna Health, Inc. v. Davila*, 542 U.S. 200, 207–208 (2004). As relevant to this case, the statute requires that, "[e]xcept as provided in [the ERISA saving clause, 29 U.S.C. 1144(b)(2)(A)], the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a); *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44–45 (1987). The plaintiffs argue that the plain meaning of that provision requires the court to conclude that Tenn. Code Ann. § 47-14-103 is preempted insofar as it would apply to ERISA-covered benefit plans. The defendants argue, however, that no such preemption occurs, because Tenn. Code Ann. § 47-14-103 is a statute of general applicability that does not "relate to any employee benefit plan," as the term "relate to" is used in the relevant preemption provision. [4]

---

[4] The defendants also argue that ERISA does not require preemption here because Tennessee's usurious interest statute includes a criminal provision, Tenn. Code Ann. § 47-14-112, and ERISA, by its own terms, does not preempt "generally applicable criminal law." 29 U.S.C. § 1144(b)(4). At most, though, that would mean that ERISA does not preempt the criminal component of the statute, which is not at issue here. What is at issue here is Tenn. Code Ann. § 47-14-103 as a civil cap on permissible interest.

Neither party has identified any precedent from the Sixth Circuit definitively resolving this issue. The plaintiffs instead ask the court to adopt the reasoning of the Seventh Circuit *in Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645 (7th Cir. 2001), in which the court concluded that an ERISA-covered plan could impose late payment terms including interest rates that, in a general context, would have violated Wisconsin's anti-usury statute. *Id.* at 653. The Seventh Circuit acknowledged that preemption might occur if the statutes at issue directly conflicted, but it chose to construe the Wisconsin statute—which included an "exception for cases in which a higher rate is authorized by other statutes"—not to apply. *Id.*

The same analysis is persuasive here. Tennessee's anti-usury statute includes an exception "[f]or all transactions in which other statutes fix a maximum effective rate of interest for particular categories of creditors, lenders, or transactions." Tenn. Code Ann. § 47-14-103(1). ERISA is an "other statute" that expressly authorizes an alternate ceiling for interest: "the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26." 29 U.S.C.§ 1132(g)(2). The court accordingly construes Tenn. Code Ann. § 47-14-103 not to apply to debts for unpaid contributions under ERISA—and notes that, if the court did not so construe the Tennessee statute, preemption would likely dictate the same result. The court accordingly will strike the Fifth Affirmative Defense.

### 5. Pre-Suit Notice and Arbitration (Sixth and Eighth Affirmative Defenses)

The contract between Triton and the union set forth certain procedures regarding delinquencies, including the following:

> In the event the report and contributions are not received by the Funds by the fifteenth (15th) day of the month after the due date, the Administrator will issue a notice to the delinquent Employer advising the Employer of the delinquency and requesting payment. The notice will warn the Employer that a late charge and interest are assessed if contributions are not received by the tenth (10th) day of the

21

> month following the due date. In addition, the notice will caution the Employer that the delinquency will eventually be referred to Legal Counsel.

(Doc. No. 56-1 at 20.) As the Sixth Affirmative Defense, the defendants assert that compliance with that procedure was a condition precedent to filing suit and that the plaintiffs failed to comply with that condition. (Doc. No. 71 at 5.) Similarly, the defendants assert, as the Eighth Affirmative Defense, that the plaintiffs failed to comply with the contract's grievance provision, which requires that "[a]ll grievances and disputes (other than jurisdictional disputes) arising out of the interpretation or application of this Agreement" be submitted to arbitration. (Doc. No. 56-1 at 27.)

As a preliminary matter, the court notes that the plaintiffs argue in their Reply that—in addition to the substantive grounds for striking these defenses that they initially identified—the court should strike the Sixth Affirmative Defense because it fails to comply with Federal Rule of Procedure 9(c), which "provides that a pleading denying the performance or occurrence of a condition precedent 'shall be made specifically and with particularity.'" *Heights Driving Sch., Inc. v. Top Driver, Inc.*, 51 F. App'x 932, 939 (6th Cir. 2002) (quoting Fed. R. Civ. P. 9(c)). This argument is without merit. This particular (ostensible) condition precedent simply involves the failure to provide a required notice. It is not clear what other detail could possibly be necessary other than asserting, as the defendants have, that the notice was not sent. The defendants were not required to list every hour of the day or date of the year in which something did not happen.

Substantively, the plaintiffs argue that the court should strike these defenses because the plaintiff benefit funds were not parties to the underlying agreement, which was between Triton and the union. The defendants do not dispute that it was, as a formal matter, the union—not the legally distinct entities that are the benefit plans—that executed the contract. The defendants argue, however, that the funds were intended beneficiaries and are bound by the agreement's arbitration and grievance provisions. *See, e.g.*, *Whaley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No.

22

1:14-CV-82, 2014 WL 12676124, at *2 (E.D. Tenn. Apr. 21, 2014) (holding that the plaintiff was "subject to the arbitration clause as a purported beneficiary of the contract").

Generally speaking, to qualify as a third-party beneficiary, a plaintiff must show that:

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

> (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

> (b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016) (quoting *Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 70 (Tenn. 2001)). It may be debatable whether the funds would satisfy that test, but it is not so beyond the realm of possibility that it would support striking the pleaded defenses—particularly given that some of the factors, including the "circumstances surrounding performance" may pose factual questions. *See Fishbein v. Miranda*, 670 F. Supp. 2d 264, 275 (S.D.N.Y. 2009) (holding that employee benefit fund was intended third-party beneficiary of a collective bargaining agreement). The court accordingly will not strike either the Sixth or Eighth Affirmative Defense, although the court again stresses that this outcome depends at least as much on the stage of proceedings and the allocation of burdens as it does on any assessment of the substantive merits of the defense.

## 6. Notice of Breach and Opportunity to Cure (Seventh Affirmative Defense)

In at least some situations, "Tennessee caselaw requires notice and an opportunity to cure" deficient performance under a contract. *Greg Calfee Builders LLC v. MaGee*, 616 S.W.3d 545,

23

555 (Tenn. Ct. App. 2020). The defendants assert that no such notice or opportunity occurred here. Whether that is true or not is a factual issue beyond the scope of a motion to strike. That said, it may nevertheless be appropriate to strike this defense, if, factual issues aside, the plaintiffs have identified some legal ground for concluding that there is no meaningful possibility that the defense will succeed.

Although the plaintiffs' briefing on this defense is relatively short, they have carried that burden. As a preliminary matter, the court notes that the defendants have not actually identified any caselaw suggesting that notice and an opportunity to cure are required in all Tennessee breach of contract cases. Indeed, the case on which they rely (1) limits its analysis to construction defects and (2) stresses that, even in that setting, the requirement of notice and an opportunity to cure is not "absolute." *Id.* In any event, this is not a claim under Tennessee common law contract principles. It is a collection action under ERISA. Any idiosyncratic features of Tennessee common law that are incompatible with the prerequisites for filing suit under ERISA are therefore completely preempted. *See Smith v. Belk, Inc.*, No. 3:13-CV-332-TAV-CCS, 2013 WL 6181455, at *6 (E.D. Tenn. Nov. 26, 2013). The defendants have not identified any provision of ERISA, any term of the contract at issue here, or any rule from ERISA-related caselaw that would impose an opportunity-to-cure requirement over and above the agreed-upon notice provisions already addressed by the Sixth Affirmative Defense. The Seventh Affirmative Defense, therefore, will be struck.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Reconsider and Dissolve Preliminary Injunction (Doc. No. 63) will be denied, and the plaintiffs' Motion to Strike Defendants'

Affirmative Defenses (Doc. No. 75) will be granted as to the First, Fifth, and Seventh Affirmative Defenses and denied as to the Fourth, Sixth, and Eighth Affirmative Defenses.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge